# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MIDDLESEX WATER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) |
| | ) Judge |
| 3M COMPANY (f/k/a Minnesota Mining | ) |
| and Manufacturing, Co.); JOHN DOE | ) **COMPLAINT AND DEMAND FOR** |
| DEFENDANTS 1-49 | ) **JURY TRIAL** |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Middlesex Water Company, by its undersigned attorneys, alleges upon information and belief, as follows:

## I. NATURE OF THE ACTION

1. Plaintiff, Middlesex Water Company ("Plaintiff" or "Middlesex"), brings this action for damages arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendant in connection with the contamination of Plaintiff's public drinking water supply with the toxic per- or polyfluoroalkyl substances PFOS (perfluorooctanesulfonic acid) and PFOA (perfluorooctanoic acid) (collectively "PFAS").

2. Defendant, 3M Company ("3M") marketed, developed, manufactured, distributed released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

1

3. 3M knew or should have known that PFAS is a toxin and is persistent when released into the environment and presents significant risks to groundwater, drinking water supplies and human health.

4. 3M marketed and sold PFAS with the knowledge that PFAS would be released into the environment and without warning users or others of the risks of PFAS to the environment and to human health

5. Through this action, Plaintiff seeks compensatory damages for the damage to its property, for the costs to investigate, remediate, and monitor PFAS contamination in its public drinking water supplies and the costs to investigate, design, construct, operate and maintain water treatment systems necessary to properly filter and/or treat PFAS from Middlesex's drinking water supplies, as well as punitive damages and reasonable attorneys' fees and costs.

## II. JURISDICTION AND VENUE

6. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

7. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## III. PARTIES

8. Plaintiff is a corporation organized and existing under the laws of the state of New Jersey having its principal place of business at 1500 Ronson Road, Iselin, New Jersey 08830.

9. Middlesex Water Company owns and operates regulated water utility and wastewater systems in New Jersey, Delaware and Pennsylvania.

10. Middlesex operates a public water system within Middlesex County, New Jersey that serves over 60,000 residential and commercial customer connections.

11. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware and does business throughout the United States, including conducting business in New Jersey. 3M has its principal place of business in St. Paul, Minnesota.

12. Upon information and belief, 3M marketed, developed, manufactured, distributed released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS that is the subject of this Complaint, including in New Jersey and this District, in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

13. Upon information and belief, Defendant John Does 1-49 were manufacturers or users of PFOA or users of PFOS. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those persons' actual names to the Complaint as Defendants.

## IV. FACTUAL ALLEGATIONS

14. PFOS and PFOA falls within a class of chemicals known as per and polyfluoroalkyl substances ("PFAS").

15. PFAS are non-naturally-occurring, man-made chemicals that were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

16. 3M was the only known manufacturer of PFOS and PFOS precursors in the United States.

17. PFAS are water soluble and can migrate readily from soil to groundwater, where they can be transported long distances.

18. PFAS are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

19. Water that is processed by typical municipal water treatment plants does not result in the removal, filtration or treatment of PFAS.

20. 3M marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used PFAS, including in New Jersey and this District, in such a way as to cause the contamination of Plaintiff's public drinking water supplies.

21. Prior to commercial development and large-scale manufacture and use of PFAS, principally by 3M, no such PFAS had been found, detected, or were present in the environment or Plaintiff's public drinking water supplies.

22. By at least the end of the 1970s, research and testing performed by Defendant indicated that PFAS because of its unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where it would not only remain and persist over long periods of time but would accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small.

23. Defendant's manufacturing and/or distributing of PFAS resulted in the release of PFAS into the air, surface waters, ground water, soils and landfills. Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, including in New Jersey and this District, that Defendant knew, foresaw, and/or reasonably should have known and/or foreseen that PFAS from those products would contaminate the environment including but not limited to the groundwater relied upon by Plaintiff as its public drinking water supply.

24. By at least the end of the 1970s, 3M was aware that PFAS, had been detected not only in the blood of workers at its manufacturing facilities, but in the blood of the general population of the United States in people not known to be working at or living near PFAS manufacturing and/or use facilities, indicating to 3M that continued manufacture and use of such PFAS materials would inevitably result in continued and increased levels of PFAS getting into the environment and into human blood across the United States, even in areas nowhere near or associated with specific PFAS manufacturing or use facilities.

25. By at least the end of the 1980s, 3M understood that, not only did PFAS get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, had a long half-life, meaning that it would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposures), which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposures continued.

26. At all relevant times, Defendant, through its acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to the risks of PFAS.

27. At all relevant times, Defendant, through its acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with PFAS.

28. At all relevant times, Defendant, through its acts and/or omissions, concealed and/or withheld information from its customers, governmental entities, and the public that would have properly and fully alerted Plaintiff about the possible toxicological and other risks from having any PFAS in its drinking water supplies.

29. At all relevant times, Defendant encouraged the continued and/or the increased use and release into the environment of PFAS, including into New Jersey and this District, by its customers and others, including but not limited to through manufacture, use, and release of aqueous fire-fighting foams ("AFFF") containing or made with PFOS or PFOA, and in connection with as many other products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

30. Once governmental entities and regulators began learning of the potential toxicity, persistence, and bioaccumulation concerns associated with PFAS, Defendant cited to the pervasive use of such PFAS throughout numerous sectors of the American economy (which they had intentionally and purposefully encouraged and created) and the widespread presence of PFAS in blood of Americans (which they also had negligently, recklessly, and/or intentionally caused) as an excuse and/or reason not to restrict or regulate PFAS, essentially arguing that the issues associated with PFAS had become "too big to regulate."

31. To this day, Defendant denies that the presence of any PFAS in any individual's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

32. Defendant was and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that its marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or

other handling and/or use of PFAS and PFAS containing materials, including in New Jersey and this District, would result in the contamination of groundwater including groundwater used by Plaintiff as its public drinking water supply.

33. Defendant was and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS materials to contaminate the environment would cause injury to Plaintiff.

34. Upon information and belief, Defendant's instructions, labels and material safety data sheets, if any, that were provided with PFAS or PFAS containing products, did not fully describe the environmental hazards of PFAS of which Defendant knew or should have known.

35. Throughout the 1950s, 3M's own internal animal studies consistently concluded that PFAS are "toxic."

36. A 1956 study at Stanford University, of which 3M was or should have been contemporaneously aware, concluded that PFAS manufactured by 3M bind to proteins in blood.

37. 3M knew as early as the mid-1950s that PFAS accumulate in humans and animals.

38. By the early 1960s, 3M understood that PFAS are stable and persist in the environment and that they do not degrade.

39. According to a deposition transcript from a lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS as early as 1976 because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

7

40. A 1978 study by 3M on PFAS confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

41. Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

42. A technical journal in 1970 observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

43. In 1979, a 3M scientist recognized in interoffice correspondence that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

44. According to the Minnesota Attorney General's allegations in the Minn. Lawsuit, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

45. According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

46. The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

47. A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health

and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

48. In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

49. A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript from the Minn. Lawsuit, privately characterized himself as part of the 3M "team."

50. According to Professor Giesy's deposition transcript in the Minn. Lawsuit, he worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

51. According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

52. According to Professor Giesy's deposition transcript from the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General,

in part a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

53. Defendants marketed and promoted its PFAS containing products with the assistance of industry funded trade groups including, but not limited to, the Fire Fighting Foam Coalition.

54. Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of PFOS and PFOA, in part, because of the chemicals' biopersistence.

55. 3M ceased production of PFOS and PFOA in 2002.

56. An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term . . . . *[PFAS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree.*" (emphasis added).

57. May 25, 2016, EPA issued a Notice of its revised lifetime health advisory for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion) for PFOS and PFOA. Because these two chemicals cause similar types of adverse health effects, EPA recommends that when both PFOS and PFOA are found in drinking water the combined concentrations of PFOS and PFOA be compared with the 0.07 part per billion HA level."

58. On November 1, 2017, the New Jersey Department of Environmental Protection ("DEP") announced that it would set a maximum contaminant level ("MCL") for PFOA in drinking water of 0.14 parts per billion.

59. On June 8, 2018, DEP recommended an MCL for PFOS in drinking water of 0.13 parts per billion.

60. Middlesex currently has at least seventeen wells in its Middlesex County System that are above both EPA's health advisory guideline and/or New Jersey's proposed MCL for PFOS and/or PFOA, individually or combined.

## FIRST CLAIM FOR RELIEF
### (Negligence)

36. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

37. Defendant had a duty to exercise reasonable care in its design, engineering, manufacture, development, fabrication, testing, release, training of users of, production of informational materials about, handling, selling, use, and/or distribution of PFAS, including a duty of care to ensure that PFAS did not pollute the environment thereby contaminating Plaintiff's public drinking water supply.

38. Defendant owed a duty of care towards Plaintiff that was commensurate with the inherently dangerous, harmful, injurious, environmentally-persistent, toxic, and bio-accumulative nature of PFAS.

39. Defendant failed to exercise ordinary care by acts and/or omissions that permitted, allowed, and/or otherwise resulted in the contamination of Plaintiff's public drinking water supply with PFAS, including all such acts and/or omissions referenced in this Complaint.

40. Defendant knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users of, production of informational materials about, handling, use, and/or distribution of PFAS

and/or other acts and/or omissions as described in this Complaint could likely result in the contamination of Plaintiff's public drinking water supply.

41. Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendant, its agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in the contamination of Plaintiff's public drinking water supply with PFAS.

42. Defendant, through its and/or omissions as described in this Complaint, breached its duty to Plaintiff.

43. It was reasonably foreseeable to Defendant that Plaintiff would likely suffer the injuries and harm described in this Complaint by virtue of Defendants' breach of its duty and failure to exercise ordinary care, as described herein.

44. But for Defendant's negligent acts and/or omissions, Plaintiff would not have been injured or harmed.

45. Defendant's negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff as described herein.

## SECOND CLAIM FOR RELIEF
### (Common Law Negligent Failure to Warn)

36. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

37. Defendant had a duty to exercise reasonable care in its design, engineering, manufacture, development, fabrication, testing, release, training of users of, production of informational materials about, handling, selling, use, and/or distribution of PFAS, including a duty of care to not only ensure that PFAS did not pollute the environment thereby contaminating

Plaintiff's public drinking water supply but also a duty to warn Plaintiff of the dangers associated with PFAS.

38. Defendant owed a duty to warn Plaintiff of the dangers associated with PFAS that was commensurate with the inherently dangerous, harmful, injurious, environmentally-persistent, toxic, and bio-accumulative nature of the chemical.

39. Defendant's failure to warn permitted, allowed, and/or otherwise resulted in the contamination of Plaintiff's public drinking water supply with PFAS.

40. Defendant knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users of, production of informational materials about, handling, use, and/or distribution of PFAS and/or other acts and/or omissions as described in this Complaint could likely result in the contamination of Plaintiff's public drinking water supply and had a duty to warn Plaintiff of this danger.

41. Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendant, its agents, servants, and/or employees, failed to warn Plaintiff of the dangers associated with PFAS.

42. Defendant, through its and/or omissions as described in this Complaint, breached its duty by failing to warn Plaintiff of the dangers associated with PFAS.

43. It was reasonably foreseeable to Defendant that Plaintiff would likely suffer the injuries and harm described in this Complaint by virtue of Defendant's breach of its duty to warn.

44. But for Defendant's negligent failure to warn, Plaintiff would not have been injured or harmed.

45. Defendant's negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff as described herein.

### THIRD CLAIM FOR RELIEF
### (Common Law Strict Liability Failure to Warn)

46. During the time periods that Defendant manufactured, used and/or distributed PFAS, Defendant knew of the risks associated with PFAS including that PFAS were toxic, bioaccumulate in in the environment, are water soluble and can migrate readily from soil to groundwater, where they can be transported long distances.

61. As a manufacturer of PFAS and PFAS-containing products, Defendant had a duty to provide adequate warnings to Plaintiff and the public of the risks posed by PFAS.

62. Defendant knew of the risks associated with PFAS and failed to provide a warning that would lead an ordinary reasonable user or handlers of PFAS to contemplate the dangers associated with PFAS or an instruction that would have allowed Plaintiff to avoid damage to its property.

63. Despite Defendant's knowledge of the dangers associated with PFAS, Defendant did not issue adequate warnings to Plaintiff, communities or governmental agencies relating to the dangers PFAS posed to drinking water supplies.

64. Plaintiffs and others would have heeded legally adequate warnings and would have taken steps to ensure that PFAS were not used in a manner that would result in contamination of public drinking water supplies.

65. Defendant's PFAS were unsafe because a warning could have made them safer at virtually no added cost and without limiting their availability.

66. As a direct and proximate result of Defendant's failure to warn, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, treatment and monitoring costs to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Willful and Wanton Conduct Claim for Punitive Damages)**

47. Plaintiff incorporates the allegations contained in all prior paragraphs of this Complaint as if fully stated herein.

48. At all times pertinent hereto, the conduct of Defendant in causing, permitting, and allowing the release of PFAS into the environment, thereby contaminating Plaintiff's public drinking water supply was more than simple negligence, momentary thoughtlessness, inadvertence, or error of judgment on the part of Defendant. Instead, Defendant's acts and/or omissions were actuated by actual malice and/or accompanied by a wanton and willful disregard of Plaintiff who foreseeably might be harmed by Defendant's acts or omissions.

49. Defendant's wanton and willful acts and omissions proximately caused and continue to proximately cause damage to Plaintiff's public drinking water supply in addition to creating conditions that are harmful to human health and the environment.

50. Defendant's conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to Plaintiff and a reckless indifference to its welfare.

51. Defendant's conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of Plaintiff so as to warrant the imposition of punitive damages.

**FIFTH CLAIM FOR RELIEF**
**(Private Nuisance)**

52. Plaintiff incorporates herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

53. Defendant's acts and omissions with respect to PFAS caused and/or continue to cause a material, substantial, and/or unreasonable interference with Plaintiff's use and/or enjoyment of its properties and has materially diminished and/or continues to diminish the value of such property.

54. Defendant's material, substantial, and/or unreasonable interference with the use and/or enjoyment of Plaintiff's property and/or continuing substantial and/or unreasonable interference with such use and/or enjoyment constitutes a continuing private nuisance.

55. Defendant's creation and/or continuing creation of a continuing private nuisance proximately caused and/or continues to proximately cause damage to Plaintiff in the form of property damage of a type not common to the general public, for which Defendant is liable.

### SIXTH CLAIM FOR RELIEF
### (Past and Continuing Trespass)

56. Plaintiff incorporates herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

57. Defendant's intentional and/or reckless acts and/or omissions have resulted and/or continue to result in the unlawful release and/or threatened release of PFAS under, onto, and/or into Plaintiff's public drinking water supply.

58. The PFAS present in Plaintiff's public drinking water supply were at all relevant times hereto, and continue to be, the property of Defendant.

59. The invasion and presence of the PFAS in Plaintiff's public drinking water supply was and continues to be without permission or authority from Plaintiff.

60. The presence and continuing presence of PFAS in Plaintiff's public drinking water supply constitutes a continuing trespass.

61. Defendant's past and continuing trespass upon Plaintiff's public drinking water supply has proximately caused and/or continues to proximately cause damage to Plaintiffs and the other Class members in the form of property damage, for which Defendant is liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Enter judgment in its favor and against Defendants on each Count of this Complaint;

B. An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, engineering, treatment and monitoring costs incurred by Plaintiff, or for which Plaintiff is or was legally responsible, to comply with the EPA's public health advisories and the Commonwealth's soil and groundwater cleanup standards and drinking water standards and criteria;

C. An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

D. An award for punitive damages; and

E. An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

MIDDLESEX WATER COMPANY,
By Their Attorneys,

*/s/ Albert Telsey*
Albert I. Telsey
*New Jersey Attorney ID #016961985*
Meyner and Landis LLP
One Gateway Center Suite 2500
Newark, NJ 07102
Tel.: (973) 624-2800
Fax: (973) 624-0356
atelsey@meyner.com

Richard W. Head (NH Bar #7900)
*(pro hac vice application pending)*
Of Counsel
SL ENVIRONMENTAL LAW GROUP PC
450 Mission Street, Suite 400
San Francisco, CA 94105
Tel. (415) 348-8300
Fax. (415) 384-8333
Email. rhead@slenvironment.com

Kevin J. Madonna (NY Bar #2981181)
*(pro hac vice application pending)*
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road
Hurley, NY 12443
Tel. (845) 481-2622
Fax. (845) 230-3111
Email. kmadonna@kennedymadonna.com

DATED: October 25, 2018